Case number 20-1479, Daikin Applied Americas Inc. and Super Radiator Coils Petitioners versus the EPA. Mr. Rogers for petitioners, Mr. McDermott for respondent. Good morning, counsel. Mr. Rogers, please proceed when you're ready. Good morning, your honor. My name is Charles Rogers. I'm present today arguing on behalf of whether the final rule providing for the listing of the Highway 100 County Road 3 site is arbitrary and capricious and contrary to law because the EPA did not establish with substantial evidence that the underlying aquifers are interconnected. The theory of the EPA is expressed in very succinct terms in their brief on page court docket 31, otherwise page 22 of the brief, the first paragraph. There they make it clear that their theory is that chemicals have been released or were released over the years from the surface and made their way through an underlying very shallow drift aquifer, which is immediately under and adjacent to a site that the petitioners are presently investigating and remediating. And that thereafter the contamination made its way through successive lower aquifers, then through a aquitard called the St. Peter aquitard down to the Prairie du Chien. The duty of the EPA in this regard is outlined in 40 CFR part 300 app A. The EPA is duty bound to provide substantial evidence and a rational scientific explanation, establishing connectivity. That is their burden. There can be no presumption of connectivity. And as this court made clear in genuine parts, where there is a confining unit or an aquitard between two aquifers, there is no connectivity. The hazardous ranking manual, 50 Fed Reg 55,553 outlines four general methodologies that the EPA is to employ in establishing a connection between the underlying aquifers. First, they should present the court and petitioners with borings, establishing that there is no connection or that there is a connection between the aquifers that are relevant to the site. Here, the EPA has presented the court petitioners with no borings within the confines of the site, establishing connectivity. If I could address the court to a diagram that is on page court docket 49 of petitioners. I can just interject, ask a clarifying question. In this case, there isn't any dispute that there are contaminants in both layers that you say are separated by an aquitard and the EPA doesn't accept that. There are contaminants in the aquifers. Is that right? That's correct, your honor. There are contaminants in all four aquifers that are the subject of this dispute. The theory though, your honor, is that they have to show just because there's contamination in all four aquifers, you can't presume that they're interconnected. You have to show that the interconnection either with boring showing that since there's a confining unit, that the confining unit is not continuous throughout the or you have to do a pop test. The reason it would matter whether or not they're interconnected is whether the connection somehow artificially inflates the scoring so that it becomes a priority for listing. But I don't need you to have proposed how one would look at two separate sites and describe them as below the threshold for scoring. I mean, you can see that there is contamination under the surface. As I read EPA, that's all they're saying. They're not making a conclusion about where it comes from. They're not making a source of it. They're just saying, look, this is a problem and it's a problem for a large number of people. And it's a risky enough kind of contaminant that the EPA has an obligation to investigate further. Your honor, I don't think... Sorry. Go ahead. I'm sorry. No, it's brief. This provides an overview of the description of the site provided by the EPA. Here we see that the description of the site is a small triangle immediately under and adjacent in the drift aquifer to the petitioners, a site that the petitioners are presently investigating and remediating. If this court were to find... I'm sorry, Mr. Rogers, which page? 16. I'm sorry. I'm looking at page eight and court docket 16 of our brief, petitioner's brief. Which is a diagram. Correct. Is that what you're referring to? That's what I'm referring to. I'm sorry. And that diagram makes it very clear, I'm sorry, that they have put a bullseye on the site by which both Daikin Applied and Super radiator coils are remediating. If this court were to find that there is a connectivity... That's not EPA's diagram. That's your diagram, your expert's diagram, right? Correct. But it is based upon the description of the site on joint appendix 309. I don't think there's any dispute that we have misrepresented any notion of where the boundaries of this site are. So the importance of that is that if indeed, then there is some argument that connectivity has been established, the may well be, we hope it's not true, but that EPA could say, since you've contaminated the drift aquifer, you've contaminated the Prairie du Chien. And that clearly is not the case because they haven't established this level of connectivity. That's why it's vitally important to our clients. Isn't that all going to be worked out in subsequent stages? Because at this stage, it's true that you haven't been excluded, but the possibility of you being affirmatively included to the point that you're on the hook, won't that be worked out at subsequent stages rather than at this preliminary stage? We certainly hope so, your honor. But since the burden is on the listing to stand, because they haven't done so, they don't have boring tests, they don't have pup tests, they don't have observed migration. They say since we have contamination, as your honor has pointed out in four layers, we've done all we need to do. Well, we've pointed out that as they say that as contaminants degrade as they go further down through the various aquifers. Here at the St. Peter aquifer above the aquitard is far cleaner than the contamination that we see in the Prairie du Chien, suggesting an alternate source. Also, there's aging analysis, isotope analysis showing that, well, typically what would happen as contamination makes its way through the eons, through the strata, it gets older and older and older. The contamination we see in the St. Peter, which is above the aquitard, is substantially older than what we see in the Prairie du Chien. EPA does not respond to that argument at all. They haven't proven connectivity in any way, shape, form, or matter. Therefore, if we submit, the listing should be vacated. Let me make sure my colleagues don't have additional questions for you at this point, Mr. Rogers. Thank you. We'll hear from you on rebuttal. Thank you. Mr. McDermott. Good morning, Your Honors. My name is Martin McDermott. I'm from the Justice Department, and I represent the United States Environmental Protection Agency in this case. Good morning, Mr. Rogers. Good morning. I want to thank the court for letting me appear without a mask because I don't think you could hear me if I had one on. So this is, I do appreciate that. But I guess, I guess I would say in response to much of what Mr. Rogers just said, that one of the first, there's two things that I think might strike a neutral reader of the briefing in this case. And one of them, I think, maybe the first one is that, wow, this case is so complicated. But actually, it's really not that complicated. And the second question I think is posed is, why are these petitioners bringing this case at all? The fact is that they make concessions right in their reply brief. I think they give the game away. Okay, let me just read that. I could ask the court to turn its attention to page four of their reply brief, where essentially, they can see that EPA is not required to show the source. And they can see that the Prairie Aquifer is heavily contaminated and is contaminating the There really is not a legitimate fight here. Well, let me ask you this, if they're right, suppose that EPA just issued a listing and said, there's interconnectivity. And we're just asserting that we don't have to say anything to support it. I think that would be that would be an error. But I don't even think they're saying that actually, I think the critical thing is that they are misinterpreting the HRS regulations. And here, I would direct the court's attention to what we said in our brief, it's 55 Federal Register at 51553. And although the HRS regulations are very complicated, what they established there is that if you have contamination and excessive aquifers, and here you have descending aquifers, all four of them are contaminated. EPA is entitled in a situation, that situation where there are observed releases in the aquifers, that to assume that the inner aquifers are interconnected, and EPA apply that here to find that there is a plume, which obviously goes from somewhere on the surface, because the Prairie Aquifer is highly contaminated. And they do not, Dakin does not object to that at all. So you have a giant plume that's coming from somewhere on the surface. Where exactly? We don't know. Is it from Dakin's property? We don't say it is, we don't know, we're not there yet. But it's coming, we know it's coming from somewhere. And so we have a giant plume here and we don't, and then what EPA did was it looked for like confirming evidence to support that and it found a multiplicity of ways by which contaminants can make their way from the surface into the Prairie Aquifer. Mr. McDermott, I take it that Mr. Rogers' client's concern is whether they will be able to assert the defenses, the geological defenses that they have at a later stage. And is there any reason to think that they wouldn't? Like they point to, why did you select these wells? There are other wells that may account for some of the leakage between the layers. They're not discussed or water migration. Is there anything that they're precluded from challenging as a geological or factual matter after the EPA has done the investigation that the listing triggers? Yes, this listing does not include any such evidence from coming in. And if it were to be the case that there was some remedial action down the line, they would be able to raise those issues readily before the court or whoever was raising it before the agency. You said the two questions are, is it really complicated? And why are the petitioners bringing the case? Do you have a theory about why they are bringing the case? I think the best I can figure is they just spent an awful lot of ink on the question of their liability. Basically, they say here, they present this false narrative where they say EPA hasn't proven that it's us. And for me, that's just, that's a remarkable assertion in a case where the plume is denominated a groundwater plume with no identified source. I don't know how it could be more clear that no one is saying that Daikin is the source. Could you imagine a scenario in which, and I'm not saying it's this case, but could you imagine a scenario in which there's overwhelming evidence that there's a potential source that can't possibly be the source because of some geological formation that's indisputably the case that it exists. And then EPA does a listing based on a no identifiable source. And someone who's within the geographic zone of that just says, wait a minute, we just can't possibly be the source. I know that EPA says no identifiable source, but it's arbitrary and capricious not to carve us out. Is that conceivable or do you just think that's just not even a hypothetical that could exist? It's almost approaching inconceivable because I think that in an NPL listing process, it's absolutely not a finding of liability. And so if you identify, if you characterize a site as having an unidentified source, then it's not, you haven't made a determination as to whether or not a particular source is or is not the problem. So in a case like this, what EPA did was it, and you can see this in my brief, I think at page 16, I do a demonstrative of, it shows sort of the rough outlines of the plume, but you can see there, EPA, what EPA said was probably somewhere around 10 to 12 possible sources. I think they're actually called that in the demonstrative, which is in the record. And it's right at the very beginning of the record where EPA says these are possible sources. So EPA, you know, arrayed those sources there and said, this is a bunch of potential candidates. I take it, Nicole, what about the flip side? So suppose the agency decides there's a bunch of potential sources. Let's say there's 10. Yes. There's 10 potential sources. We're not going to do the work to figure out as among nine of them because, you know, that way for a later stage, it would, and it's just too difficult at this stage to figure it out. We can, though, carve out one of them. Would it be appropriate and possible for the agency to say there's no identifiable source with regard to the nine that are within the confines of the site as we're describing them? But there is one because of, you know, they have a moat. A moat's a bad example in a water, but you know what I'm saying. I think that, I mean, presumably the site investigation would pick up on the idea that that's not, that that would not be a proper source. I mean, let's think about it like a nursery school or something like that. You know, it might be that someone during the investigatory phase would say, we're not going to list the nursery school as a possible source because we have no reason to do so. But generally speaking, that the list of possible sources here is, it's really just suggestive and it's not, in no sense is it binding. And you could, the sources could expand. Anyone could, in the future, could come forward with sufficient proof to say the way you've conceptualized the plume, there is no plume boundary. There is no defined site that says exactly where the contamination begins and ends. And someone could say, you really need to sweep in some more. This plume is probably a lot bigger than you thought it was. And that's, that's all, that would all be fair play. And that could very well happen after, as a result of further investigations. I think that we can understand that the process and the, and the very tentative nature of the listing, I think the difficulty for DICON and Mr. Rogers' clients is, does the public understand that? And the more sort of rough and ready information, especially where the EPA identified are, you know, closer to its, the area of its potential responsibility, that, you know, it affects property values. It makes people look at them askance. And so I think, you know, from their perspective, the question is, I mean, maybe even if the, the surface level information, the wells that have been identified were more broadly spread, they wouldn't be here. I mean, I'm just, you know. I think, I think it's, this is a case of EPA takes what it has before it at this stage. It's a limited investigation, frankly. I mean, it's very thorough. You can see that from the documentation record. It's very thorough, but it is limited. And EPA takes what it has. So it had proof that the drift aquifer is very contaminated. And then it had proof that the next one down is contaminated. The next one down is contaminated. And it defines a site at this early juncture by virtue of where do I have wells that are, that are hot? Where are the wells where there are these solvent and solvents and degradation products? And it says that's, that's the general scope of it. But it's, it wasn't, EPA did not, could have gone out probably a multiple number of locations in that drift aquifer and drilled new wells. It's very expensive to drill wells like that. They could have found more, but, you know, they took what they were given on that because they were, they, it was clear that they were not focusing on any particular facility. You have 10 facilities out there probably about, each one of them could have come to court and could have said, I see you've got me on there as a possible source. You know, I, I, why don't I go to court and see if I can get my name stricken from any consideration as even a possible source. At some point it becomes preposterous because I don't think Diken even would stand there with a straight face and argue that they're not a possible source. You don't see any section of the brief where they say, we're like the nursery school, our site is clean. In fact, they actually submitted a comment letter and said, we're out here remediate, remediating our site already. And I'm not sure how they thought that helps them, but it, but it shows that they're, they are, they are a properly considered a possible source. And there's no plausible reason why, what, what was coming from their site should ever be like carved out preliminarily as out of bounds for consideration down the line. And it's also ironic that they, they protest that EPA should have done a deeper site investigation here. And then the purpose of the Superfund is to, is once a site is listed, that you can actually access Superfund money to do more investigation. So the very process that they want to short, short circuit here is a process that if they're, if they're right about this, this confining layer, um, which is not a question that EPA addressed as vis-a-vis their site, then they will, that will be something that can be addressed later. Okay. Thank you, Mr. McDermott. Let me make sure my colleagues don't have additional questions for you. Okay. Thank you very much. I appreciate it. Thank you. Mr. Rogers, you'll have two minutes for a rebuttal. I think we're unable to hear you right now. Let's make sure we can get the audio. Can you hear me? Yes. Thank you, Your Honor. Let me touch on the issues of primary concern. Number one, if the EPA truly looked at this site as we're going to do a bunch of exploration and we're not targeting anybody, they should have just described the site as a wide area of the parade of shame without trying to define upper layers of aquifers that are included within the site definition, then everything would be open. I would like the EPA to represent directly then that there would be absolutely no prejudice as a result of this listing because their duty right now, they have the burden, the burden to show that there's connectivity when they're ranking this as an interconnected series of aquifers. That's their burden. If they then send me a letter saying, hey, we think you're liable for this entire Superfund site, burden shift, the visibility issues arise. It's a much different case. Right now, it is their burden to show connectivity. This suggestion in this case is very prejudicial to our client. The final issue is whether or not they can assume interconnectedness. They seem to say, and they cite you in 55,553 to comments that they provide to the regulation, not the regulation itself. The regulation in 40 CFR part 300 F8 says quite clearly, they cannot presume connectivity between aquifers. They need to prove it. And they admit basically today, they haven't proven it. All they're saying is since we have this and we've given them rational theories, whether alternate sources, in fact, there's W23, which they know is a source, a known source, and they haven't pointed it out in the record. They say it's a red herring. W23 on the Riley Tarr site is a known source, both with records within the administrative record and records that we pointed you to outside of the administrative record that just further the same point, records of decision, admissions. Why are they ignoring W23? I thought I read, Mr. Rogers, that it wasn't an entirely obvious known source because it used the particular contaminants that are found, at least some of them that are found in this aquifer. Your Honor, if you look at the record of decision for Riley Tarr, JA665, there they say admittedly that this is a known site of VOCs, a known source of VOCs making its way through a leaky multi aquifer well. Although I take it that on the EPA's view, that's getting way ahead of them. But again, when they say there's no source, no known source, that's a misrepresentation. There is a known source. And what they're really implying by virtue of this site is putting the target squarely on my client's back by placing us right at the apex of a pyramid of contamination without any evidence of connectivity. Are there other wells that they should have referenced in their listing that they didn't reference? Is that part of your claim? Well, I think that what they should have done, Your Honor, is simply just refer to this as a broad area of Prairie du Chien contamination. And it's even broader. There's many wells that we outline in our brief that weren't included in their definition of Prairie du Chien, the deep contamination, because there isn't any notice of connectivity. But if they were, I'm sorry, if they were to argue that there's, I'm sorry, go ahead. No, no, you go ahead. If they were going to argue that there's some connectivity between the aquifers, yes, there's a much broader area of contaminated wells in the drift that they've totally ignored. We point that out in detail in our brief. Okay. Thank you, Mr. Rogers. Thank you to both counties. I take this case under submission.
judges: Srinivasan, Henderson, Pillard